JOHN FISHER, APPELLEE, v. CHARLES W. CHAMBERS, EXECUTOR, APPELLANT.

FILED APRIL 13, 1909. No. 15,634.

Appeal: EVIDENCE. "Questions of fact, and upon conflicting testimony, are to be decided by the trial jury, and a verdict will not be set aside on the ground of want of sufficient evidence to support it unless the want is so great as to show that the verdict is manifestly wrong." *Sycamore Marsh Harvester Co. v. Grundrad*, 16 Neb. 529.

APPEAL from the district court for Lancaster county: LINCOLN FROST, JUDGE. *Affirmed.*

*Strode & Strode,* for appellant.

*R. D. Stearns* and *J. C. McNerney, contra.*

FAWCETT, J.

This action was brought in the district court for Lancaster county to recover for personal injuries sustained by being crushed in a freight elevator in the livery barn of defendant. The petition alleges the negligence of defendant's servants, and particularly of defendant's foreman, as the cause of said injury. The answer denies any negligence on defendant's part, alleges that the accident was the result of plaintiff's negligence, that at the time of the injuries complained of plaintiff was at defendant's place of business without invitation from the defendant,

and without defendant's knowledge or consent, and that plaintiff assumed the risk of injury in the work in which he was engaged at the time he received the injuries complained of. The reply is a general denial.

The evidence shows substantially that defendant was the proprietor of a livery barn in the city of Lincoln; that the Anheuser-Busch Brewing Association, one of defendant's patrons, was in the habit of keeping one of its heavy delivery wagons in defendant's barn; that on the evening before the accident the driver of the delivery wagon notified plaintiff's employer that one of the wheels needed repairing and was advised that the repairs would be made by 9 o'clock the next morning. About 7 o'clock in the morning plaintiff, by direction of his employer, went to defendant's barn for the purpose of getting the wheel. The evidence as to what occurred after plaintiff arrived at the barn is conflicting. Plaintiff testified that he spoke to the foreman of the barn and requested him to assist in getting the wheel from the wagon; that the foreman at first refused, and plaintiff started away, whereupon the foreman called him back, and then the foreman and one or more other employees of defendant engaged with plaintiff in the work of removing the wheel from the wagon; that it was a heavy wagon, weighing about 2,000 pounds. The wagon was kept on the ground floor of the barn. When brought in in the evening, they would run it into its regular position for the night. In doing so, they always attempted to run the wagon as near to the freight elevator shaft as possible, in fact, running it just close enough so that the hubs of the wagon would not strike the elevator. On the morning in question it appears to have been standing within 6 to 18 inches of the elevator. We think the evidence clearly shows that the wagon was so near the elevator that it was impossible to remove the wheel without standing on the floor of the elevator shaft. Plaintiff testifies that, in connection with defendant's foreman and such other employees, they obtained boxes to push under the axle after it had been lifted by a jack so that

the wheel could be removed; that defendant's servants had obtained the jack, and defendant's foreman and one other employee were standing, holding the lever of the jack ready to lift the wagon so that plaintiff could push the boxes under; that, in order to get into position to do this, it was necessary for plaintiff to stand upon the elevator space; that before doing so he asked defendant's foreman if it was safe to stand there, and was assured that it was; that the question was asked a second time, and again he was assured that it was perfectly safe for him to step in there; that he stepped in, and while standing on the floor of the elevator shaft, and leaning forward for the purpose of manipulating the boxes, the elevator came down upon him; that, when the elevator struck him, he yelled and fell upon his face, and that the elevator still descended and crushed him badly. He denies having seen the elevator passing up or down during the time he was in the barn. Defendant's foreman testified that, when plaintiff came there and asked him to help take the wheel off the wagon, he told plaintiff that he would do so as soon as he got the horses hitched up; that he had a number of horses on the floor all ready for hitching; that plaintiff said he must have the wheel at once; that he, the foreman, declined to help him, and that thereupon plaintiff set to work himself to try and get the wheel off the wagon; that neither he nor any of the men under him took any part in assisting plaintiff to remove the wheel and were no near him at the time he was struck by the elevator. The man who was running the elevator testified that, after plaintiff got there and was standing near the wagon, he went up with the elevator to the floor above, in full view of plaintiff, loaded two buggies on the elevator, brought them down to the lower floor and unloaded them, and again ascended to the floor above for another load; that, when he went up the second time, plaintiff was standing within ten feet of the elevator shaft, within full view; that he loaded on some more buggies and started down the second time; that as he approached the ground floor he

heard plaintiff "holler," and that he immediately stopped and reversed his elevator.

There was a trial to a jury, and a verdict and judgment for plaintiff. Defendant rests his claim for reversal upon the one ground that the verdict and judgment are not sustained by sufficient evidence, and that therefore the court erred in overruling defendant's motion for a new trial. Defendant argues that, under the testimony as above outlined, the verdict of the jury cannot be sustained; that plaintiff is contradicted and his testimony destroyed by the testimony of the two witnesses for defendant, above referred to, and that plaintiff's testimony is entirely without corroboration.

We are unable to concur in this view of the case. A further reference to the testimony will show that plaintiff is in fact corroborated by both of defendant's witnesses, while each of defendant's witnesses, to a certain extent, contradicts the other. For instance, defendant's foreman denies that he or his employees under him took any part in assisting plaintiff in his efforts to remove the wheel, yet the elevator man testifies that, when his elevator struck the plaintiff, Smith (the foreman) had gone "to get something to jack the wagon up with." "Q. How do you know? A. When I came down with the first load of buggies, they was talking about getting something to lift it up with." Again he testifies: "Q. You knew Smith was getting a jack to jack it up to get it out of there? A. Yes, sir. Q. Did you hear them talk about what they were jacking it up for? A. Yes, sir. Q. What did they say they were jacking it up for? A. To get the wheel off. Q. At the time you were running the elevator? A. Yes, sir." This testimony of the elevator man strongly corroborates the testimony of plaintiff that Smith and the other employees were assisting plaintiff in the work in which he was engaged, just as plaintiff claims. Turning to Smith's testimony on the question as to whether or not the elevator had been going up and down with buggies while plaintiff was there, we have the following: "Q. Did

you notice the elevator coming down just before he called? A. No, sir; I did not. Q. Did you notice the elevator go up that morning? A. No, sir. Q. Did you notice buggies being taken up or down? A. I did not notice any buggies going up and down when he was under it. Q. Were there any buggies on the elevator at the time he got crushed? A. I could not say now whether there was or not. Q. What buggies were you hitching to? A. Single rigs. Q. Were they rigs that were up or down below in the barn? A. We had them all down before he came. Q. You were not taking down any buggies at that time? A. No, sir. Q. Had not been for some time? A. No, sir. Q. The elevator was not running up and down, was it? A. No; not then at the present time. Q. No; there was no buggies to take down then? A. No; I guess there was not. Q. They were all down, what you were hitching to? A. All down, what I wanted to hitch to. Q. You did not want any more to come down then? A. I could not say whether they had any more to come down right then or not. Q. But there wasn't any coming down at that time? A. I do not think there was. Q. Had there been, you would have known of it at that time? A. You bet I would." This evidence strongly corroborates the testimony of plaintiff that the elevator had not been running, and that there was nothing to indicate to him that he was liable to be struck by it, except the single fact that he was stepping into the elevator shaft, a place which he admits he knew was a place of danger, but into which he went on the assurance of defendant's foreman that there was no danger in doing so. In the light of this testimony, we cannot say that the jury were not warranted in finding that plaintiff's injuries were received as the result of defendant's negligence, without fault on plaintiff's part.

Complaint is made that defendant was not given an opportunity to fairly cross-examine plaintiff. The cross-examination of plaintiff certainly shows that he was either intoxicated at the time he was upon the witness stand, or that he is a very eccentric character. The cross-

examination is the most rambling, disconnected and eccentric of any that the writer has ever read. The fact remains, however, that defendant's counsel pursued their cross-examination from interrogatories 498 to 624, inclusive, covering 16 pages of the record. At its conclusion no objection was made by counsel that they had not had a fair opportunity to cross-examine plaintiff, nor was any request made for a postponement of the hearing to give plaintiff time to sober off, if he were in fact intoxicated. In fact, no objections were made or exceptions taken by defendant at the time, and we think it is too late to make such objections here. Indeed, there is great force in the argument of counsel for plaintiff that this exhibition of plaintiff on the witness stand, whether from intoxication or eccentricity, could not have been prejudicial to defendant, but would be much more apt to prejudice plaintiff in the eyes of the jury. However that may be, the jury and the trial judge saw the plaintiff upon the witness stand, heard the testimony given, and observed the manner in which it was given, and it was for the jury to determine, under all the circumstances, just what weight should be given to it. If the conduct of plaintiff while thus testifying was the result of eccentricity or natural excitability, no blame could attach to him for that. If it was the result of intoxication, there can be no doubt but that the learned judge who was hearing the case would, if he had been requested so to do, have stopped the hearing of the case until the next morning and have required the plaintiff to submit himself for cross-examination in a due state of sobriety.

No objection is made as to the amount of recovery, nor as to any of the instructions given by the court, nor as to any of the rulings upon the admission or exclusion of evidence. The case, as presented, was therefore peculiarly one for the jury.

The verdict of the jury has been sustained by the trial court, and its judgment is

AFFIRMED.